**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CLO VIRTUAL FASHION INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>ZHEJIANG LINGDI DIGITAL TECHNOLOGY CO., LTD. (D/B/A LINCTEX),<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:23-CV-00274-JRG-RSP |

**CLAIM CONSTRUCTION ORDER**

On October 31, 2024, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 10,733,773 ("the '773 Patent") and U.S. Patent No. 11,410,355 ("the '355 Patent") (collectively "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 63, 67, 68)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I. BACKGROUND ........ 3

II. APPLICABLE LAW ........ 5

III. LEVEL OF ORDINARY SKILL IN THE ART ........ 10

IV. CONSTRUCTION OF AGREED TERMS ........ 11

V. CONSTRUCTION OF DISPUTED TERMS ........ 12

A. Preamble of the Independent Claims of the ’773 Patent and the ’355 Patent ........ 12

B. “substantially” terms and “candidate ending point(s)” terms ........ 17

VI. CONCLUSION ........ 34

## I. BACKGROUND

Plaintiff CLO Virtual Fashion, Inc. ("CLO") alleges that Defendant Linctex infringes the Asserted Patents. Shortly before the start of the October 31, 2024 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The Asserted Patents are titled "Method and Apparatus for Creating Digital Clothing." The '773 Patent was filed on October 23, 2015, and issued on August 4, 2020. The '355 Patent was filed on July 10, 2020, and issued on August 9, 2022. The Asserted Patents share a common a specification, and relate "to computer simulation technology that processes 2D clothing patterns and thus creates digital clothing." '773 Patent at 1:17–19.

The Abstract of the Asserted Patents states:

> A computer simulation technology that processes 2D clothing patterns and thus creates digital clothing. The purpose of the present disclosure is to easily adjust a length of another segment to be sewn the same as a length of a selected segment on a pattern when free-sewing.

Claim 1 of the '773 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. *A method of creating digital clothing executable by a computing device storing patterns and draped digital clothing*, the method comprising:
> setting a first selected segment by inputting the first selected segment to be sewn on a first segment on a pattern; and
> setting a second selected segment, comprising inputting a starting point of the second selected segment on a second segment,
> wherein the second selected segment is sewn to the first selected segment,
> detecting a current cursor position,
> *displaying a point on the second segment as a candidate ending point of the second selected segment to make a length of the second selected segment substantially equal to a length of the first selected segment*,

> connecting the starting point to a present point on the second selected segment closest in distance to the current cursor position to form a line based on a difference between the current cursor position and the present point being less than a first reference value,
>
> moving the present point to the candidate ending point, in response to the difference between the present point and the candidate ending point being less than a second reference value,
>
> displaying a difference value between the length of the first selected segment and a length of the line, selecting the present point as an ending point of the second selected segment, in response to a user input, and
>
> setting, as the second selected segment, a section of the second segment between the starting point and the ending point.

Claim 1 of the '355 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. *A method of creating digital clothing executable by a computing device storing digital clothing patterns for draping simulation*, the method comprising:
>
> setting a first selected segment to be sewn on a first segment on a pattern; and
>
> setting a second selected segment comprising:
>
> setting a starting point of the second selected segment on a second segment wherein the second selected segment is sewn to the first selected segment,
>
> determining a present point on the second segment based on a current cursor position,
>
> moving the present point to a candidate ending point on the second segment, in response to the difference between the present point and the candidate ending point being less than a reference value, *wherein the candidate ending point is determined to make a second length of the second selected segment substantially equal to a first length of the first selected segment*,
>
> selecting the present point as an ending point of the second selected segment, in response to a user input, and
>
> setting as the second selected segment, a section of the second segment between the starting point and the ending point,
>
> wherein, when the second length is *substantially equal* to the first length, at least one of the first length, the second length and a difference value between the first length and the second length is displayed in a first color, and
>
> wherein, when the second length is substantially different from the first length, at least one of the first length, the second length

> and the difference value is displayed in a second color, the second color being different from the first color.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed.

Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred

embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for

> example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard

for measuring the scope of the [term].” *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App’x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard “must provide objective boundaries for those of skill in the art.” *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art (“POSITA”). *See Phillips*, 415 F.3d at 1313 (“[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.”). The Federal Circuit has advised that the “[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field.” *Env’tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). “These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art.” *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff contends a POSITA would have a Bachelor’s or graduate degree in Mechanical Engineering, Textile Engineering, Computer Engineering, Computer Science, Graphic Design, or an equivalent degree, with at least 2-3 years of experience in software design for the creation of digital or virtual clothing. (Dkt. No. 63 at 10).

Defendant contends a POSITA would have the following

> [A] master’s degree or equivalent degree from an accredited institution in Computer Science, Computer Engineering, Applied Mathematics, Computational Science, or a similar discipline. This education would generally include relevant principles of Computer

> Science, Data Structures and Algorithms, Mathematics, Programming Languages, Software Engineering, Human-Computer Interaction, Numerical Methods, Computer Graphics, and Computer-Aided Geometric Design, as well as three or more years of industry experience as a software engineer working on interactive graphical user interfaces, computer-aided design (CAD), two-dimensional (2D) pattern design systems, numerical methods, curve representations, polygons, and 2D meshes. This practical experience should include developing and implementing software for pattern drafting and modification in the context of garment manufacturing. The POSITA would have a good understanding of 2D CAD software, garment pattern drafting, garment construction techniques, and more generally have knowledge of the garment design and manufacturing industry and its processes. More education could substitute for less experience, and vice versa.

(Dkt. No. 67 at 8-9).

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a POSITA would have a Bachelor's or graduate degree in Mechanical Engineering, Textile Engineering, Computer Engineering, Computer Science, Graphic Design, Applied Mathematics, Computational Science, or an equivalent degree, with at least 2-3 years of experience in software design for the creation of digital or virtual clothing. The Court finds that any differences in the parties' proposals do not appear to be significant for the purpose of claim construction.

## IV. CONSTRUCTION OF AGREED TERMS

The parties agreed to the construction of the following claim terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "draped" / "draping"<br><br>'773 Patent: Claim 1, 7<br>'355 Patent: Claim 1, 6 | The term "draping" means a process of creating 3D clothes from 2D patterns through computer programs. The term "draped" means formed by the process of "draping." |
| "determining a present point on the second segment based on a current cursor position" | Not indefinite. Plain and ordinary meaning. |

| | |
|---|---|
| ’355 Patent: Claim 1 | |

Dkt. No. 69-1 at 20, 27 (Joint Claim Construction Chart). In view of the parties’ agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties’ agreed constructions.

The day before the claim construction hearing, the parties submitted an Amended Joint Claim Construction agreeing to the construction of the following additional claim term:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| “the second length is substantially different from the first length”<br><br>’355 Patent: Claims 1, 6 | Not indefinite. Plain and ordinary meaning. |

Dkt. No. 71-1 at 16 (Amended Joint Claim Construction Chart). In view of the parties’ agreement on the proper construction of the identified term, the Court hereby **ADOPTS** the parties’ agreed construction.

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of six terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. Preamble of the Independent Claims of the ’773 Patent and the ’355 Patent

| Disputed Term | Plaintiff’s Proposal | Defendant’s Proposal |
|---|---|---|
| “A method of creating digital clothing executable by a computing device storing patterns and draped digital clothing” | The preamble is limiting and should be given its plain and ordinary meaning. | The preamble is not limiting and should be given its plain and ordinary meaning. |
| “An apparatus for creating digital clothing comprising a computing device storing patterns and draped digital clothing” | The preamble is limiting and should be given its plain and ordinary meaning. | The preamble is not limiting and should be given its plain and ordinary meaning. |

| | | |
|---|---|---|
| "A method of creating digital clothing executable by a computing device storing digital clothing patterns for draping stimulation" | The preamble is limiting and should be given its plain and ordinary meaning. | The preamble is not limiting and should be given its plain and ordinary meaning. |
| "An apparatus for creating digital clothing" | The preamble is limiting and should be given its plain and ordinary meaning. | The preamble is not limiting and should be given its plain and ordinary meaning. |

**1. Analysis**

The preamble of Claim 1 of the '773 Patent recites: "A method of creating digital clothing executable by a computing device storing patterns and draped digital clothing." The preamble of Claim 7 of the '773 Patent recites: "An apparatus for creating digital clothing comprising a computing device storing patterns and draped digital clothing." The preamble of Claim 1 of the '355 Patent recites: "A method of creating digital clothing executable by a computing device storing digital clothing patterns for draping stimulation." The preamble of Claim 6 of the '355 Patent recites: "An apparatus for creating digital clothing." As indicated, all of the preambles recite "creating digital clothing." The parties dispute whether the preamble of Claims 1 and 7 of the '773 Patent, and the preamble of Claims 1 and 6 of the '355 Patent are limiting.[3]

The Federal Circuit has stressed that there is no "litmus test" for determining whether a preamble is limiting. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). Therefore, "[w]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003). In other words, "the effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of

[3] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 63 at 10-16); Defendant's Responsive Claim Construction Brief (Dkt. No. 67 at 9-15); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 68 at 4-8).

what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)

Here, each of the four disputed preambles are limiting because they are "a necessary and defining aspect of the invention," rather than "an introduction to the general field of the claim." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). The preambles describe either "a method of" or "an apparatus for" creating digital clothing that tethers the claim body to the entire invention. The bodies of the independent claims address virtually sewing two digital patterns together along segments set by a user. The entire operations are performed on a computer to create digital clothing designs as recited in the preamble.

Likewise, the '773 and '355 specifications describe a method for creating digital clothing. All of figures either describe or illustrate creation of digital clothing, and the entire specification is directed to and describes how to virtually sew two 2D digital patterns together along seam lines to create a 3D digital clothing. The title of the invention is "Method and Apparatus for Creating Digital Clothing," the Abstract recites "[a] computer simulation technology that processes 2D clothing patterns and thus creates digital clothing;" and the Field of the Invention is "computer simulation technology that processes 2D clothing patterns and thus creates digital clothing." '773 Patent at 1:16–18. Thus, the intrinsic evidence indicates that the patentee intended to encompass digital clothing created by virtually free-sewing 2-dimensional patterns together to form a 3-dimensional article of digital clothing using computer programs. As recited in the preamble, creating digital clothing is a fundamental characteristic of the invention. Therefore, the preambles were intended to limit the claims. It would be improper to read the claims to apply to fields other than digital or virtual clothing. The entirety of the claims are directed to "creating digital clothing."

The preambles in Claims 1 and 7 of the '773 Patent, and Claim 1 of the '355 Patent also

recite that the method is executable by or the apparatus comprises: "a computing device storing patterns and draped digital clothing" (or similar). This provides important context for the claims, which address computer simulations to create digital clothing. The specification also underscores its key nature, as described above. *See Corning Glass*, 868 F.2d at 1257; *General Electric Co.*, 179 F.3d at 1361–62. Accordingly, the Court finds that the preambles are limiting, because they breathe "life and meaning" and provide further positive limitations to the invention claimed. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed. Cir. 1985).

Defendant argues that the "draping" term serves only as a purpose or intended use of the claimed invention. (Dkt. No. 67 at 10). Defendant contends that there are no steps in the claims describing creating 3D clothes, or any steps describing the conversion of 2D patterns into 3D clothes. *Id.* According to Defendant, the product resulting from the claimed steps may be used as an input for "draping," but draping would occur after the steps in the claim are completed. *Id.* Defendant further argues that draping is an altogether separate process from the method described in the claimed steps. *Id.* Defendant contends that fabric and clothing patterns are indisputably 2D steps in the clothing design and manufacturing process that do not require draping. *Id.* at 11. Defendant also argues that during prosecution the patentee further indicated that draping was provided only as an explanation to provide context, and was not intended to be incorporated into the claims. *Id.* (citing Dkt. No. 67-3 at 8 n.2).

Turning to Claim 1 of the '355 Patent, Defendant argues that the recited "first selected segment" and "second selected segment" are found on the patterns, which are 2D shapes that are designed to be cut from flat fabric. (Dkt. No. 67 at 12). Defendant contends that none of the steps in the claim mention draping or 3D clothing. *Id.* Defendant further argues that the figures from the patents depict the segment selection as a 2D process. *Id.* (citing '773 Patent at Figure 7). Defendant

also argues that everything that precedes draping relates only to two dimensional cloth patterns. *Id.* at 13.

The Court disagrees with Defendant's analysis. Defendant does not dispute that the '773 and '355 specifications describe a method of and apparatus for "creating digital clothing." As discussed above, "creating digital clothing" is the essence of the claimed invention. Instead of addressing this fact, Defendant focuses on "draping" and attempts to direct the discussion solely to "3D clothing." Defendant argues that the preamble cannot be limiting, because the body of the claim addresses manipulation of 2D patterns, not draping as recited in the preamble of Claims 1 and 7 of the '773 Patent, and Claim 1 of the '355 Patent. (Dkt. No. 67 at 10). This is an inaccurate reading of the claims and the '773 and '355 Patents. As discussed above, "creation of digital clothing" is the essence of the invention, not a mere statement of intended use.

Moreover, Defendant's draping argument is flawed. Virtual or digital clothing design necessarily involves storing 2D clothing patterns on a computer, providing the user with the ability to manipulate the shape of and set additional seam lines in those 2D patterns, setting the seam lines or segments to be virtually sewn together, and sewing the patterns together to create virtual 3D clothing. "Draping" is the process of creating those 3D virtual clothes from the 2D fabric patterns. Thus, draping necessarily includes and requires *sewing* the 2D patterns together and rendering them in 3D. The elements of each independent claim of the '773 and '355 Patents recite sewing two selected segments from two different digital patterns together. Sewing is part of the draping process whereby the 2D patterns are sewn together and draped into 3D digital clothing. The independent claim bodies each recite sewing digital fabric patterns together to create the claimed digital, draped clothing. This is not intended use language, but what the patentees intended to encompass by the claims.

Finally, Defendant contends that it is "well established" that preambles can and should be analyzed in parts, and it is not an all-or-nothing approach. (Dkt. No. 67 at 14) (citing *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) ("The [district] court erred in determining that it had to construe the entire preamble if it construed a portion of it.")). The Court does not agree that analyzing preambles in parts is "well established." *See, e.g., Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371 (Fed. Cir. 2020) ("We also are disinclined to sanction finding a preamble 'partially' limiting by splicing it as the district court did here.") (internal citations omitted). Instead, what is well established is that there is no "litmus test" for determining whether a preamble is limiting. *Bicon*, 441 F.3d at 952. Unlike *TomTom*, the preambles of claims in the '773 and '355 Patent recite "creating digital clothing" and "draping" that are tied to body of the claims. Likewise, a POSITA would not understand the footnote in the prosecution history (Dkt. No. 67-3 at 8 n.2) to overcome the other overwhelming intrinsic evidence indicating that the preamble is limiting.

**2. Court's Construction**

For the reasons set forth above, the preambles of Claims 1 and 7 of the '773 Patent, and the preambles of Claims 1 and 6 of the '355 Patent are limiting and are given their plain and ordinary meaning.

**B. "substantially" terms and "candidate ending point(s)" terms**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "displaying a point on the second segment as a candidate ending point of the second selected segment to make a length of the second selected segment substantially equal to a length of the first selected segment" | Not Indefinite; Plain and Ordinary Meaning. | Indefinite. |
| "wherein the candidate ending point is determined to make a second length of the second selected segment substantially equal to a first length of the first selected segment" | Not Indefinite; Plain and Ordinary Meaning. | Indefinite. |

**1. Analysis**

The phrase "displaying a point on the second segment as a candidate ending point of the second selected segment to make a length of the second selected segment substantially equal to a length of the first selected segment" appears in Asserted Claims 1 and 7 of the '773 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "wherein the candidate ending point is determined to make a second length of the second selected segment substantially equal to a first length of the first selected segment" appears in Asserted Claims 1 and 6 of the '355 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

Defendant contends that the claim terms above are indefinite for two reasons. Defendant first argues that a POSITA would not know with reasonable certainty what is "substantially equal" in the context of the claim. Defendant next argues that a POSITA would not know with reasonable certainty what "candidate ending point for the second selected segment" falls within the scope of the claim.[4]

**a. "substantially equal"**

Regarding the first issue, the Court finds that like the term "substantially different," the term "substantially equal" is not indefinite.[5] It is well established that "claim language employing

[4] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 63 at 17-29); Defendant's Responsive Claim Construction Brief (Dkt. No. 67 at 15-29); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 68 at 9-17).

[5] Defendant originally contended that the term "substantially different" was indefinite. (Dkt. No. 67 at 15-23). As discussed above, a day before the claim construction hearing the parties submitted an Amended Joint Claim Construction agreeing that the term "substantially different" is not indefinite and should be given its plain and ordinary meaning. (Dkt. No. 71-1 at 16). The Court finds that the analysis for the term "substantially different" overlaps and is useful in analyzing the term "substantially equal." Accordingly, both "substantially" terms will be discussed.

terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014); *see also, e.g., Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 65–66 (1923) (finding "substantial pitch" sufficiently definite because one skilled in the art "had no difficulty … in determining what was the substantial pitch needed" to practice the invention). Here, a person of ordinary skill in the art would understand that the word "substantially" is a term of approximation used when comparing the length of two line segments on 2-dimensional clothing patterns. Turning first to the claim language, a POSITA would understand that in a free sewing simulation of creating virtual clothing, two selected segments are sewn together. *See, e.g.*, '773 Patent at 6:9–19, 14:49–50 ("wherein the second selected segment is sewn to the first selected segment."). Moreover, Claim 1 of the '355 Patent provides one indication of when the lengths are "substantially equal" by reciting the following:

> 1. A method of creating digital clothing executable by a computing device storing digital clothing patterns for draping simulation, the method comprising:
>
> setting a first selected segment to be sewn on a first segment on a pattern; and
>
> setting a second selected segment comprising:
>
> setting a starting point of the second selected segment on a second segment wherein the second selected segment is sewn to the first selected segment,
>
> determining a present point on the second segment based on a current cursor position,
>
> moving the present point to a candidate ending point on the second segment, in response to the difference between the present point and the candidate ending point being less than a reference value, wherein the candidate ending point is determined to make a second length of the second selected segment *substantially equal* to a first length of the first selected segment,
>
> selecting the present point as an ending point of the second selected segment, in response to a user input, and
>
> setting as the second selected segment, a section of the second segment between the starting point and the ending point,

> wherein, when the second length is *substantially equal* to the first length, at least one of the first length, the second length and *a difference value between the first length and the second length* is displayed in a first color, and
>
> wherein, when the second length is *substantially different* from the first length, at least one of the first length, the second length and the difference value is displayed in a second color, the second color being different from the first color.

’355 Patent at 14:43–15:10 (emphasis added). Given this claim language, a POSITA would understand that whenever computer software for creating virtual clothing is comparing two segment lengths from two 2-dimentional patterns, the measurements may not be exactly precise, and the software must account for a range in which the segment lengths are deemed either equal or different.

Indeed, Claim 1 recites a “difference value,” and further indicates that “when the second length is substantially equal to the first length … a difference value between the first length and the second length is displayed in a first color.” Claim 1 further recites that “when the second length is substantially different from the first length … the difference value is displayed in a second color.” Independent Claims 1 and 7 of the ’773 Patents, and independent Claim 6 of the ’355 Patent also recite displaying a difference value between the first length and the second length. The difference value provides an indication of when something is “substantially equal” or “substantially different.” Thus, the claim language provides the first indication that a POSITA would be able to determine the scope of the claim with reasonable certainty.

The remaining intrinsic evidence provides further objective boundaries to a POSITA. The specification indicates that when creating digital clothing, a user performs a sewing simulation of two patterns. (*See, e.g.*, ’773 Patent at 1:27–39). For example, in Figure 6 from the ’773 Patent shown below, two patterns 303 and 304 are to be sewn together to create a 3-dimensional clothing by selecting, calculating, and virtually sewing segments from each pattern together.




’773 Patent at Figure 6. The first selected segment 306 has a starting point 302 and an ending point 305. (’773 Patent at 9:5–7). After the user defines the first segment, the user defines the starting point 309 of the second selected segment 312. (’773 Patent at 9:8–9, 9:17–23). The computer program then helps the user identify a candidate ending point 310 for the second segment such that first segment is the same length as the second segment. (’773 Patent at 9:19–23). This allows the user to digitally sew first and second 2-dimensional patterns 303 and 304 together via the portion of the first segment 306 from starting point 302 to end point 305 to the portion on the second segment 312 demarcated by points 309 and 310. (’773 Patent at 9:3–27).

The specification explains that one reason for wanting the lengths of two segments to be the same is to avoid wrinkles. ’773 Patent at 6:11–17 (“If the length of the first selected segment is the same as the second selected segment, the digital clothing may be sewn without the wrinkles thereon. If the lengths of the first and second selected segments are not the same, wrinkles are

created on the selected segment with the longer length, thus making aesthetic effects.”). Importantly, the specification also recognizes that the first and second segments are part of virtual fabric patterns, and different fabrics have different characteristics. *Id*. Digital fabric, like real clothing, may stretch. ’773 Patent at 1:40–46 (“the digital fabric, which stretches well, including the two segments may seem as being sewn with the same length in the same manner as real clothing.”).

Accordingly, the specification explains that wrinkles may not be created even if the lengths of the two segments are not exactly the same depending on how the fabric stretches. *Id*. at 6:17–19 (“However, even if the lengths of the first and second selected segments are not the same, the wrinkles may not be created according to how much the fabric stretches.”). The specification further explains fabric stretching, and even provides examples of how much variance may be allowed to still deem the first and second segments equal to accomplish the objective of minimizing wrinkles. *Id*. The specification states that “[f]or example, knit and chiffon stretching well do not create wrinkles if the difference between the first and second selected segments is lower than one inch. Cotton and denim not stretching well may not create wrinkles if the difference between the first and second selected segments is lower than one centimeter.” *See, e.g.*, ’773 Patent at 7:44-59, 10:14-24, 10:47-56, 14:13-22.

The first and second segments can thus be different and still be deemed equal because of the fabric’s properties. Indeed, Defendant’s expert identifies reasons why the segments may not be exact in the context of computer software. (Dkt. No. 67-1 at ¶ 30) (discussing “a. computer’s numerical precision; b. user’s limited dexterity in operating the pointing device; c. limited screen resolution; d. limits of human visual perception; e. manufacturing tolerances of garment construction.”). Accordingly, a POSITA would understand that the modifier “substantially” in the

claims allows for this variance. *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("If the claims, read in the light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.") (quoting *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136, cert. denied, 358 U.S. 884, 79 S. Ct. 124, 3 L. Ed. 2d 112 (1958)).

Finally, the patentees amended the claims to add "substantially" during prosecution of the '773 Patent . (Dkt. No. 67-3 at 3, 5). The patentees explained that "[t]wo stitch lines to be sewed may have different length, for example to make a pleat." *Id.* at 9. The patentees further explained that "[t]he present claims recite features that intelligently interprets the operator's pointing operation, suggests candidate end point of the stitch line, and selects nearest candidate point selected by operator." *Id.* This indicates that the patentees' amendments indicated that "substantially" was added to the claims to remove a requirement of an exact dimension. Accordingly, Defendant has failed to show by clear and convincing evidence that the claim language is indefinite, because the intrinsic evidence indicates that a POSITA would be able to determine the scope of the claim with reasonable certainty. *Verve v. Crane Cams*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("It may of course occur that persons experienced in a technologic field will have divergent opinions as to the meaning of a term, particularly as narrow distinctions are drawn by the parties or warranted by the technology. … But the fact that the parties disagree about claim scope does not of itself render the claim invalid.").

To be sure, the Federal Circuit has confirmed that the term "substantially" does not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." *See, e.g., Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed.Cir.2012). In *Deere*,

like here, the patentee added the phrase "substantially planar" to distinguish its claimed invention from prior art. *Id.* The Federal Circuit affirmed the district court's determination and found that because "substantially planar" reasonably describes the claimed subject matter to one skilled in the art, it does not render the claim at issue indefinite. *Id.* Similarly, the Federal Circuit found that the term "'substantial' is a meaningful modifier implying 'approximate,' rather than 'perfect.'" *Playtex Products, Inc. v. Procter & Gamble Co.,* 400 F.3d 901, 907–09 (Fed. Cir. 2005). In *Playtex*, the Federal Circuit found the district court erred by introducing a requirement of a "numerical tolerance to the flatness." *Id*.

Turning to Defendant's arguments, it contends that the specification does not explicitly use the term "substantially equal," and that there is no express guidance as to scope of this term. (Dkt. No. 67 at 17). Defendant notes that the word "substantially" was not included in the original drafts of the claims, but instead was added in an amendment to the claims. (*Id.* at 17-18). Defendant also argues that the examples in the specification "may illustrate the outer limits of what lengths will and will not avoid wrinkles," but do not actually give a POSITA proper guidance as to how to select the "candidate ending point" of the second selected segment. (*Id.* at 18-19) (citing '773 Patent at 7:44–49).

Defendant further contends that using the motivation of avoidance of wrinkles to determine the candidate ending point would lead to non-sensical results. (*Id.* at 19-20). According to Defendant, a POSITA could not infer what is the permissible range of making the second selected segment length "substantially equal" given the motivation of avoidance of wrinkles. (*Id.* at 20). Finally, Defendant contends that the guidance of "one inch" or "one centimeter" is problematic, because a one-inch difference for a segment that is one-inch long is a very big difference, while a one-inch difference for a segment that is 25 inches long is a much smaller difference. (*Id.* at 21).

Defendant argues that the one inch tolerance may not be the correct figure depending on the length of the segment to be sewn. (*Id.* at 22).

The Court disagrees with Defendant. First, Defendant's argument that the specification does not provide sufficient guidance for what the tolerance "range X-1 to X+1" is inapplicable, because "substantially" is used as a term of approximation to avoid a strict numerical boundary. *Anchor Wall Sys. v. Rockwood Retaining Walls*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) ("[W]ords of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter.'") (citations omitted). Accordingly, the Court reject Defendant's argument that a strict numerical boundary must be recited in the claims.

Defendant also misreads the '773 and '355 specifications by treating examples of how stretchy fabrics (*e.g.*, knit and chiffon) and less stretchy fabrics (*e.g.*, cotton and denim) may have different length tolerance values as strict limits. (Dkt. No. 67 at 15-16). The '773 and '355 Patents indicate that these examples illustrate how different fabrics behave differently when sewn together and draped into 3D digital clothing. (*See*, *e.g.*, '773 Patent at 10:51–56). Specifically, they illustrate how a difference value between the lengths of the first and second selected segments might change according to fabric type or other user preference or design factors. *Id*. at 10:45–47. Again, Defendant incorrectly argues that a strict numerical boundary must be recited in the claims. In summary, the claims do not require exact tolerances or strict ranges. Moreover, this is contrary to how a POSITA would understand the specification. Indeed, Defendant's expert agrees and concedes that "substantially" is used as a term of approximation in the claims of the '773 and '355 Patents. (Dkt. No. 67-1 at ¶ 27; Dkt. No. 63-5 at 138:11-17). Accordingly, Defendant has failed to prove by clear and convincing evidence that "substantially equal" is indefinite.

**2. "candidate ending point(s)"**

Regarding the second issue, the Court finds that Defendant failed to show by clear and convincing evidence the term "candidate ending point(s)" is indefinite. The independent claims, discussed above, also include the phrases "candidate ending point" and "second selected segment." '773 Patent Claims 1 and 7; '355 Patent Claims 1 and 6. The plain language of the claims recites that a "second selected segment" is set on "a second segment." *See, e.g.*, '773 at 14:46–48 (Claim 1 "*setting a second selected segment*, comprising inputting a starting point of the second selected segment *on a second segment.*") (emphasis added); *see also*, '773 at 15:33–34 (Claim 7); '355 at 14:48–50 (Claim 1), 15:33–35 (Claim 6).

The claim language itself provides additional context to inform a POSITA that a "second selected segment" and "candidate ending point" cannot be free-floating on a pattern, but have to be set on an existing segment on the pattern. (Dkt. No. 63-4 at 3). A POSITA would understand that all four claims at issue are directed to "creating digital clothing" using "digital clothing patterns" and "draping simulation." *Id.* A POSITA would further understand that the claimed "patterns" are not just any patterns but "digital clothing patterns." (*Id.*; Dkt. No. 63-5 at 106:19-25). Likewise, a POSITA would understand that the claims recite that the "second selected segment" is to be sewn to the first selected segment. (Dkt. No. 63-4 at 4; Dkt. No. 63-5 at 108:22-109:4). Thus, the "second selected segment" cannot just be any segment on the clothing pattern. Instead, it must be a segment constrained in shape, length, and location on the garment pattern by being a portion of a pre-determined second segment so that the second selected segment can be sewn to the first selected segment to form a digital clothing. *See, e.g.*, '773 Patent at 2:17–19 ("inputting a starting point of a second selected segment *onto at least one second segment*, which is to be sewn to the first selected segment;"); 2:23–26 ("and setting, as the second selected segment, *a section of the second segment* between the input starting point and the input ending

point.") (emphasis added).

The specifications also refers to these pre-set segments as seam lines. *Id*. For example, in describing Figure 1 shown below, the specification states "setting a selected segment in the *first seam line* (hereinafter, referred to as '*first selected segment*') in 10, setting a selected segment in the *second seam line* (hereinafter, referred to as '*second selected segment*') in 20." ('773 Patent at 4:29–32 (emphasis added); *see also*, 3:7–16, 5:42–66, Figures 1 to 5; Dkt. No. 63-4 at 5).



'773 Patent, Fig. 1

The specification confirms that in order to achieve the goal of the claimed invention of creating digital clothing, both the second selected segment and the candidate ending point are constrained to be on segments on the garment patterns. '773 Patent at 5:42–66. The segments are either the outlines of the garment patterns or pre-determined segments inside the pattern set by a user. '773 Patent at 4:29–32; 5:42–66, 11:10–34, Figure 1, Figure 12. The specification explains how "segments to be sewn together are set as outline of the pattern." '773 Patent at 8:5–10, 8:60–64, Figures 3-5. The points on the patterns make it easy to sew segments together between points on the patterns as shown in the annotated Figure 3 below. *Id*. The specifications discloses that "[i]n FIG. 3, the segments to be sewn on the pattern are between each of the points on the pattern." '773

Patent at 8:3–6.




’773 Patent at Figure 3. In the instances where the specification discloses a selected segment to be sewn that is inside a pattern, the specification describes the selected segments as being subsegments of preset segments. *Id.* For example, in describing Figure 12(b) shown below, the specification states that “[s]econd segments 1204 and 1209 are *set by a user*; and in FIG. 12, as user selects, as *the second selected segment 1204*, on second segment of two second segments 1204 and 1209.” ’773 Patent at 11:18–21 (emphasis added); *see also*, ’773 Patent at 11:21–27, Figure 12 (c).




The file history further confirms that the selected segments are seam lines and the candidate ending point is on the second selected segment such that the two seam lines to be sewn together have the same length. For example, the patentees argued that "[i]n the case where the lengths of the two segments (seam lines) are the same, a method is provided for recommending a candidate for end point so that the second segment (other side seam line) has the same length." (Dkt. No. 63-7 at 3).

Defendant argues that the candidate ending point's location is determined by a length. (Dkt. No. 67 at 23). Defendant contends that all points that fall within a certain length from the starting point will lie on a disk centered on the starting point. *Id.* According to Defendant, this provides an infinite number of potential points for the "candidate ending point." *Id.* Defendant argues that this does not accomplish the goal of suggesting a particular second selected segment to be sewn to the first selected segment. *Id.*

Defendant also argues that the claim does not provide guidance on when and how the second segments are determined. *Id.* at 24. Defendant contends that the specification appears to indicate there is great latitude in selecting the "second selected segment." *Id.* Defendant argues that the specification indicates that the shapes of the "first and second segments" can be varied, and describes that the second segment is acquired based not on points that exist, but on points that are "likely to exist." *Id.* at 24 (citing '773 Patent at 7:65–67, 8:5–10, 11:6–34; 8:58–64, 11:15–

18, Figure 12). According to Defendant, the selection of a line segment or shape is done at the same time that it is created. (Dkt. No. 67 at 25-36). Defendant also contends that a design software that is only capable of creating conventional and known designs defeats the point of design software, and that the software needs to allow a user the artistic and aesthetic freedom to create new designs. *Id.* at 26.

Finally, Defendant argues that even if the second segments were pre-created and followed conventional designs only, this still creates uncertainty for a POSITA. *Id.* at 28. Defendant provides the following figure and argues that even if the software suggested endpoint #3 as the "candidate ending point," a user would not know which of line #3, line #4 and line #5 was being determined as the second selected segment.




*Id.* at 28. Defendant contends that without knowledge of the second selected segment, the purpose of the invention would not be accomplished as it would not determine which second selected segment is to be sewn to the first selected segment. *Id.* at 29.

Plaintiff responds that Defendant's arguments are divorced from the claim language, the

specification, and the context of the invention. (Dkt. No. 68 at 12). The Court agrees. Defendant first contends that the candidate ending point location is not clear from length alone. This is incorrect, because the plain language of the claims states that a "second selected segment" is set on "a second segment." When given "*a starting point* of the second selected segment on *a second segment*" and a length, a "candidate ending point" can be determined. '773 Patent at 14:46–48 (Claim 1: "*setting a second selected segment*, comprising inputting *a starting point* of the second selected segment on *a second segment*.") (emphasis added).

Defendant's second argument is that the claims do not provide guidance on when and how the second segment is determined, so the candidate end point on the second segment cannot be determined with certainty. Contrary to Defendant's argument, the plain language of the claims states that a "second selected segment" is set on "a second segment." *Id*. The claims, therefore, provide sufficient guidance to a POSITA on when (before the "selected second segment" is set) and how (either the outlines of the garment patterns or segments inside the pattern set by a user) a second segment is determined.

The specification confirms that in order to achieve the goal of creating digital clothing, both the second selected segment and the candidate ending point are constrained to be on predetermined segments on the garment patterns. The segments are either the outlines of the garment patterns (Figures 3-9) or segments inside the pattern set by a user (Figures 12). '773 Patent at 4:29–32, 5:42–54, 11:13–27, Figure 1, Figure 12. The specification refers to these predetermined segments as seam lines. For example, Figure 1 indicates that a second segment is a pre-set seam line, as the specification describes "setting a selected segment in the second seam line (hereinafter, referred to as 'second selected segment') in 20." '773 Patent at 4:31–33, Figure 1. Defendant does not address this intrinsic evidence, or discuss the disclosed "seam line."

Instead, Defendant argues that "the patent explicitly notes that the embodiments showing how segments to be sewn are not limiting." (Dkt. No. 67 at 25). This is one interpretation of the specification, but the interpretation is incomplete because it fails to consider the claim language, which recites that a "second selected segment" is set on "a second segment." Likewise, Defendant's argument that a POSITA would not necessarily assume that the second segment was predetermined fails to consider both the claim language and other portions of the specifications. Again, Claim 1 of the '773 Patent recites: "*setting a second selected segment*, comprising inputting a starting point of the second selected segment *on a second segment*," and "*setting*, as the *second selected segment, a section of the second segment* between the starting point and the ending point." '773 Patent at 14:46–47, 15:4–6 (emphasis added). Setting the second selected segment as a section of the second segment necessarily requires the "second segment" to be predetermined relative to the "second selected segment."

As Plaintiff correctly argues, the focus must be on the claims, and the claims at issue are not about drawing some abstract segment and simultaneously selecting that entire segment. The claims recite *setting*, not selecting, a "section" of an existing seam line. The second segment is created before the starting point is set on the second segment, and before the software identifies a candidate ending point on the second segment. The claims require "*setting*" the first and second selected segments, and this can only happen after the first and second segments are created.

Finally, Defendant's illustration actually shows that if a user moves the cursor near line 3, the present point will be shown and the candidate end point displayed on the second segment would be line #3.




(Dkt. No. 68 at 16). While line #3, #4 and #5 share the same end point, there is no uncertainty as the software identifies which second segment can be selected based on cursor position. The user can then set the second selected segment, and the software then sews the first and second selected segments and drapes the 2D patterns to create 3D clothing.

This is supported by the claims and specifications. The ’773 and ’355 claims recite using a present point on the second selected segment closest in distance to the cursor to pick a selected segment. For example, Claim1 of the 773 Patent recites “connecting the starting point to a present point on the second selected segment *closest in distance to the current cursor position* to form a line based on a difference between the current cursor position and the present point being less than a first reference value.” ’773 Patent at 14:56–61 (emphasis added). The specification also directly addresses the scenario where there are multiple pre-created second segments. Specifically, the specification states that “[i]f the current cursor position is the closest in distance to the second segment, which includes the input starting point, *among a plurality of second segments*, the point that is the closest to the position, in which the point-clicking process has occurred, is input as an

ending point." '773 Patent at 5:62–66. In summary, the intrinsic evidence indicates that a POSITA would be able to determine the scope of the claims with reasonable certainty. Accordingly, Defendant has failed to show by clear and convincing evidence that the disputed claim language is indefinite.

### 2. Court's Construction

For the reasons set forth above, the phrase **"displaying a point on the second segment as a candidate ending point of the second selected segment to make a length of the second selected segment substantially equal to a length of the first selected segment,"** and the phrase **"wherein the candidate ending point is determined to make a second length of the second selected segment substantially equal to a first length of the first selected segment"** is not indefinite, and is given its **plain and ordinary meaning**.

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 20th day of November, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE